Good morning, Your Honors. Nicolette Glazer appearing on behalf of the petitioner in this matter, Mr. Janko Hristov Dimitrov. I respectfully will reserve three minutes of my time for rebuttal, if permitted. Oh, okay. May it please the Court. Your Honors, this case exemplifies two significant problems that are often encountered in the process of adjudicating asylum claims. The first one is the role and the mistakes sometimes made by a translator or an interpreter. And the second one is the importance of an expert opinion or the lack of such an expert opinion or knowledge in adjudicating such claims. With respect to the translation, Your Honors, as the Court is aware, almost in all asylum cases, the asylum applicant testified in a foreign language. Yet, the claim is adjudicated based on a record that is created by the testimony translated by the interpreter and on the documents that were done by a translator. There is not really a possibility to voir dire the translator a lot of time. And a lot of time, the mistake in a translation is discovered much later in the process. Yet, it is those mistakes that sometime will make or break a claim. A good translator will be able to convey the testimony of the applicant accurately. What translation error are you referring to in your abstract generality? Your Honor, what I generally refer is to the errors that occur while a translator translates the testimony of an applicant. In the case of Mr. Dimitrov, I will point, Your Honor, we had a document that was presented to the judge, a medical certificate, and that is the record at page 29. This document, Your Honor, contained a statement made by the translator that there was a crippling of the movement of the applicant from the waist down. If the court will look at the transcript, the moment that the testimony brought to that point, the seed of suspicion was planted in the judge's mind. He asked Mr. Dimitrov, were you able to walk? Did you have any injuries to your legs? And Mr. Dimitrov said, no, I was bruised. I had difficulty walking, but I didn't have any crippling of the movement down. Well, the judge said, well, you said one thing. Doctor wrote a different thing. On the motion to reopen, Your Honor, we presented a corrected translation. And that translation showed that there was no, nothing in the original medical report that contains such a diagnosis. There was not crippling a movement for the applicant, and there was no broken bones. We went the extra step, Your Honors. We presented the expert opinion of a Bulgarian physician who was able to look at the original medical certificate and the translation and stated his opinion that no such diagnosis was contained in the original document and went in and explained what the Latin jargon diagnosis was in fact. And if the court will look, it is exactly what Mr. Dimitrov testified. All right. Let me ask you this. This is what concerns me, at least reading the record. Mr. Dimitrov claims he was a gypsy. He was a Roma. Yet in certain responses as to his knowledge of that culture, the IJ noted that he didn't seem very familiar with the culture. And also, and I think very notably, though he was born in a gypsy family and lives in a gypsy neighborhood and went and played with gypsy students and children, he didn't speak the gypsy language. So the IJ doubted that he was really a gypsy and made a finding of adverse credibility and didn't believe the rest. Yes, Your Honor, and if I may. The seminal issue is, why was the IJ wrong, do you think, if he was wrong, in saying, I don't believe Mr. Dimitrov because he says he's a gypsy and I don't think he's a gypsy? Well, Your Honor, I would appreciate the time to explain. And that was my second point. Whether one is a Roma or not, it really is not a fact that is readily ascertainable. It is really a knowledge that should be entrusted to an expert. Experts are not available in immigration court often. However, in this case, the immigration judge actually took it upon himself to be an expert to determine what makes one a gypsy. Is your point that there is insufficient evidence in the record, absent expert testimony for the IJ to determine that Dimitrov was not, or there's doubt about Dimitrov being a gypsy? Yes, Your Honor, because if the court will look at it, there is a birth certificate that is included in the record. There's a baptismal certificate. I'm sorry, baptismal certificate. The baptismal certificate itself is doubtful, and I'll tell you why. The date of its inscription is November 27, 1963. The printed baptismal certificate has a printed date of 1990 blank. So it looks to me like it probably wasn't executed in 1963. It may simply be a fact that it's reciting that the inscription was made in 1963. And the stamp on it indicates that it was post-communist stamp. But that certificate has some doubt. I understand that, but the immigration judge did not have, didn't express that, and the court will look at what you may refer to. There's absolutely no comment about it. Correct, but it is certifiable. What about his lack of language as a basis for saying, I don't really believe he's a gypsy? Well, Your Honor, in the motion to reopen, we showed, actually, that most Romani do not speak a Romani language. And, in fact, we actually presented an expert opinion from the European Roma Rights Center, and that is the certified administrative record on page 52, which actually states their opinion how one would identify a Roma in Bulgaria. And if the court will look at page 52, it will see that nowhere in that expert opinion is there any mentioning that it is the language ability, or as the immigration judge put it, the Roma name that will make one a gypsy. It is the negative identity where gypsy live, what they do, how do they dress, how do they speak, the accent that they speak into the assimilated language that makes one that is inclined to out-out a Roma, the negative identity that imposes the stigma. Now, we also presented evidence that the Romani, in the process of assimilation, adopted the language of the receiving country. In fact, as the court is aware, during communist time, the communist regime forbade minority to speak a foreign language. In fact, in Bulgaria, in 1960, it was said, everybody living in Bulgaria is Bulgarian. Everybody living in Bulgaria speaks Bulgarian. You, as a minority, are not entitled to have your identity, you're not entitled to have your language, you're not entitled to have your newspapers or radio. In fact, everybody was mandated to go to a Bulgarian school. That's what Mr. Dimitrov did. He went to school in Bulgaria. His parents did not want him to speak Romani because that meant only more troubles. Now, this is a reality and documentary proof has been provided that that is what is typical for the Romani population in Eastern and Central Europe. If the court will look at it, it was the TA's questioning that implied that somehow there is another name or another dialect for Romani. There is not a single piece of evidence in the combined record that shows that a Romani can be identified by his or her name or that Romani in Bulgaria all speak a language that is not called Roma. Mr. Dimitrov said, no, I do not speak Romani because I grew up during communist time. I went to school, my parents taught me to speak Bulgarian, I'm a Bulgarian woman, so I don't speak Bulgarian. But that doesn't defeat the fact that I am the son, the grandson of a Romani. The country conditions show that people who live in gypsy neighborhoods normally speak Romani and they also show, at least one country condition, that some Bulgarians falsely claim Romani ethnic or racial background in order to claim asylum. Isn't that sufficient evidence for the IJ to rely upon? Well, Your Honor, unless there is a specified reason to point to something that shows a fabrication or that there is a proof that this particular applicant is not Romani, I believe the rule is that it is the record presented. Mr. Dimitrov bared the burden of proof. He came in, if the court would look, he testified completely consistent. He presented all the documents that he was asked for. He presented a medical certificate, which the judge doubted. It ended up, it was not doubtful, it was a problem with the translation. He had no control over that. He presented a Roma card. The judge actually said, I'm not going to give it credence. And yet the judge wanted Mr. Dimitrov to go to the same organization and ask him for a letter to say, Mr. Dimitrov is Romani, he had problems in Bulgaria, and he was married to a Bulgarian woman. I really believe that it is unreasonable for a judge to simply disregard a document when it was not submitted for authentication, it was not pointed by the trial attorney that was fraudulent or there is indicial of fraud in that, and yet to require an applicant to present a document that is duplicative and it's hearsay. What is this to say? You've expired your time. I mean, it's a brilliant argument and I enjoy listening to it. All right, let's hear from the government. Thank you, Your Honor. Good morning. May it please the Court, my name is Yanel Yusuf and I represent the Attorney General of the United States. Can you speak a little bit louder and a little bit more slowly? I apologize. Don't apologize, just make it clear. Remember, you're trying to communicate to three judges. Yes, Your Honor. In this case, I believe the record does in fact support the immigration judges, the agency's adverse credibility finding, along with the... Now, let me remind you, there was some difference in focus. We're reviewing the BIA. The BIA reviewed this de novo, so forget the IJ. Tell us focus on the BIA. Okay, Your Honor. Yes, Your Honor. Well, with respect to the Board's decision, they went through and found that the vague testimony relating to and the lack of knowledge of the petitioner of the Roma heritage and his lack of knowledge of the Roma language, as we've discussed, brought to question the veracity of the petitioner's statements, which was further brought into question by the medical report that he submitted into record that contradicted his very own testimony. Okay. So while the medical document referenced facial fractures and crippling from the waist below, the petitioner in his own testimony seemed to say that he was not aware of any broken bones or... How do you respond to the errors in translation? In that instance, it was the petitioner who submitted that document and... I know, but now that the errors are pointed out, how do you respond to it? Well, the documents that corrected that translation that was submitted with the motion to reopen, as the Board held, were filed past the 90-day limit, and the Board stated that there was no excuse for the untimely filing because the petitioner was previously made aware of this mistranslation during his testimony as well as during the immigration judge's decision as well as the Board's decision. So as to whether or not the document was mistranslated as it was before the immigration judge, before the agency, the corrective translation was not considered in that initial adverse credibility finding, so it cannot be considered based on the Board's denial of the motion to reopen. I'd like to tell you why I think the focus of the government has been misplaced on this whole issue of whether he's Roma. And that took me back to the seminal case of Lazo Mahano, which Judge Preggison and I decided many years ago involved a woman claiming refuge from El Salvador. She was a washerwoman. She had no political affiliations or beliefs, but she was persecuted by a member of the armed forces of El Salvador on the grounds that she was a subversive. And as we said there, that's the right thing to focus on, the motive of the persecutor. Why is the persecutor doing this? Not the characteristics of the person persecuted, but the persecutor. And I'm afraid the Board didn't realize that. They should have been saying, what were the motives of the persecutor? And your brief doesn't do that either. Well, to that, Your Honor, the burden of proof begins with the credibility of the... All right, but the credibility has to go to the heart. And the heart of it is what is the motive of the persecutor? And you don't say, what was the motive of the persecutor? Well, speaking to the heart of it... What do you think the motive of the persecutor was? That's a determination that would need to be made by the agency. No, they didn't focus on it. They did not focus on the motive of the persecutor. I understand that, Your Honor, but in the asylum application, the petitioner has the burden to prove that they are a refugee, and part of that burden is establishing credibility. And based on the contradiction... But it has to be credibility on something that goes to the heart. And the heart of this is the persecutor's motive. Well, based on the adverse credibility finding, we can't... No, but if he's incredible on some minor point, it makes no difference. But in this instance, the medical report and the contradiction of whether or not he was... The injuries he sustained do, in fact, go to the heart of his claim based on his unclear... Well, let's talk about that. The inconsistency, as I understand it, with... Using this bad translation, it's claimed that he couldn't have walked 2 kilometers to his parents' home. Well, he says he walked with great difficulty. He dragged himself there. What's inconsistent with that? Well, I guess that, Your Honor, the agency was reasonable in deeming that... Why was it reasonable if it was perfectly consistent to say, I had an awful lot of trouble, but I meant I had to get there, I had to get away, but I did it even though I'd suffered this beating. The inconsistency lies in the fact that the petitioner's testimony, he even said that he wasn't aware of any broken bones. However, the medical report stated that he did have broken bones, so it remains... It's one of these funny things, in both as to the nationality and the medical thing. His oral testimony was less colorful, less helpful to him than some of the other testimony. And so it's held against him. I would say he just was a man who made understatements. Well, that would be a determination made by the agency as to whether... No, but the question is whether... Has he lied in a way that goes to the heart of his case? As the agency found it, there was a discrepancy... I know the agency found it, but do they have its support? I believe that the record does, in fact, support the finding, based on, as we've stated, the lack of knowledge of the Roma language. But why does that make a difference, if that's not the focus of the whole proceeding? Just like this washerwoman in El Salvador. She didn't know what party was what party. It didn't make any difference. It's what the persecutor thinks. Don't you understand that? Yes, I do, Your Honor. In this instance, though, there was a question by the agency of whether the individual was Roma, and therefore... But that's an irrelevant question to the question of the persecutor's motive. Why is he being treated this way? It goes to that question based on the fact that, if there is a question to whether he was Roma or not, there is a question of whether the abuse he took, that he allegedly endured, was based on his Roma ethnicity. Well, you don't seem to take my point. In the case of the subversive El Salvadoran, it didn't make any difference what she was. This is what the man after her was thinking. Do you understand that? I understand that, Your Honor. All right. Not all Romas or gypsies are alike. You have gypsies in Italy, you have gypsies in France, you have them in Scandinavian countries. They're all over the place. You have them in the Middle East. And the people... I mean, my parents came from a foreign country, and the last thing they wanted was to teach me how to speak Russian. And you can see the same thing apparently took place here. They didn't want him to speak with the language of the country with an accent. Well, your opponent speaks with an accent, but she has music to her voice. Well, these are not easy cases. Okay? I believe my time is running out. All right. Thank you for your time. Thank you. Okay. Your Honor, I'm sorry. Do you want to give us an encore? So if the court has any questions, I use all my time. What do you say about the medical... the correction of the translation coming in late? Well, Your Honor, again, I believe in our motion to reopen, we specifically stated that we are asking for the numerical limits to motion to reopen not to apply because the error was not discovered until a particular time. I believe under this court's precedent, when equitable tolling is involved, it is the time of discovery that starts the period. In this case... And who should have discovered it? Well, Your Honor, I believe... I really believe this case shows that a lot of times the applicant is not in the... doesn't have the ability to discover an error of this matter. Did you come in late? Were you there from the beginning or only on the... No, I came in during the petition for review. I actually... You came in for what? For the original petition for review. I was not trial counsel. I didn't represent Mr. Dimitrov before the agency. And actually, I couldn't understand because it was this Latin jargon that was used by the physician. Language of learning in Europe. It is, Your Honor. Unfortunately, I couldn't understand anything, so I asked... Everybody should have a course in Latin. They should. I actually took one and it didn't help me anymore. So, it was a doctor who actually went in and said what actually this diagnosis was. Until that time, I couldn't be certain that... I speak the language. I couldn't say whether this was a wrong translation or I'm missing something. So, I would respectfully submit it was the question of the discovery. And the board never addressed it. There was a declaration from myself. There was an expert opinion. They never expressed any doubt as to the support of the motion to reopen. And I believe under the court's precedent... Now, if we did remand this, would you have a chance to present the right translation? Well, Your Honor, if it is remanded, I believe under the board's new rules, they will not make a factual finding. So, they will remand it to the immigration judge with direction to either conduct a new hearing or evaluate the evidence. And I would... Is there any reason not to send it back to the same IJ? I don't believe that the IJ had prejudice. I really don't believe so. I think he reasonably thought that the person was making up a story because he had a document and he had no reason to doubt that that translation was wrong. I think he had more reason to believe that the person is making up a claim. And I believe that was the problem. Well, to refresh my memory, where was this matter heard? It was heard in Seattle, Your Honor. Oh, in Seattle. And it is a pre-real ID case. And it was a what? Pre-real ID case. Okay. All right. Fine. Thank you. Thank you very much, Your Honor. The matter is submitted.
judges: Pregerson, Noonan, Bea